Filed 10/4/16  P. v. Perdomo CA2/8
Opinion on remand from Supreme Court

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B263533 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA402000) |
| v. | |
| EDWIN CASTILLO PERDOMO et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mildred Escobedo, Judge.  Affirmed as modified.

Waldemar D. Halka, under appointment by the Court of Appeal, for Defendant and Appellant Edwin Castillo Perdomo.

Richard A. Levy, under appointment by the Court of Appeal, for Defendant and Appellant Ivan Castro.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Susan Sullivan Pithey and Zee Rodriguez, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \*

In this gang-related murder case, Edwin Castillo Perdomo (Castillo) and Ivan Castro (Castro) (together appellants) challenge their convictions for first degree premeditated murder with gang and firearm enhancements.  We find no error warranting reversal.  We correct certain sentencing errors and affirm.

## PROCEDURAL BACKGROUND

Following a joint trial, a jury convicted appellants of one count of murder of Mario Castro.  (Pen. Code, § 187, subd. (a).)[1]  The jury found true an allegation the murder was willful, deliberate, and premeditated, and found true gang and firearm enhancements (§§ 186.22, subd. (b)(1)(C), 12022.53, subds. (b)-(e)(1)).  The trial court sentenced each appellant to 50 years to life in state prison, consisting of 25 years to life for the murder count and 25 years to life for one of the firearm enhancements.  The court stayed the remaining enhancements.

## FACTUAL BACKGROUND

Mario Castro[2] was shot and killed outside his workplace in Los Angeles on August 23, 2012.  He was a member of the "Tiny Winos" clique of the Mara Salvatrucha, or MS, street gang.  Appellants are active members of the "Bagos," another clique of the MS gang and rivals of the Tiny Winos.  Mario had been "green-lighted," or authorized to be killed, by his own gang because he protected another gang member who was involved in a shooting that left defendant Castro paralyzed.

On August 23, 2012, the day of the shooting, Mario was outside his workplace, approaching his wife in her car parked nearby.  According to her testimony, she heard someone yell "fuck" or "fuck you," then she heard at least three gunshots and someone screaming.  She saw a white sport utility vehicle (SUV) carrying three or four people drive away.  She noticed the right rear passenger wore a blue bandanna on his head and had a tattoo resembling a snake on his arm.  She also recognized the front passenger from high school and had known him for years.  He and Mario were friends.  (By trial, that suspect had

---

[1]    All undesignated statutory citations are to the Penal Code unless otherwise noted.

[2]    Because the victim has the same last name as one of the defendants, we refer to him by first name for clarity.

not been located.)  Mario's brother was inside the garage at the scene when he heard three gunshots.  He ran outside and saw Mario on the ground bleeding.

Mario died of three gunshot wounds.  The shots came from a single firearm consistent with a .38- or .357-caliber Magnum.  A search of the scene did not yield any bullet casings, suggesting a revolver was used.  Security video footage from nearby businesses showed that just before the shooting, the white SUV drove away from Mario's workplace, made a left turn, drove into and through a parking lot, and traveled back toward Mario's workplace.

A few days after the shooting, officers arrested Castillo for driving without a license.  He was driving the white SUV used in the shooting, and the vehicle belonged to him.  A search of the SUV yielded a loaded .38-caliber revolver and additional bullets under the rear seat and two catheter bags in the front passenger door pocket.  Testing determined the revolver did not match the bullets recovered from Mario's body.  Twelve latent fingerprints were found, three of which matched Castillo.

Officers arrested Castro the next day while he was with his girlfriend Candy Pasqual.  Officers searched Castro's residence, uncovering four .38-caliber bullets, eight .22-caliber bullets, a cylinder for a .38-caliber revolver, a dark blue and white bandana, a wheelchair, and the same brand and type of catheter bags as found in the SUV.[3]  The cylinder could be interchangeably used in different revolvers and the bullets were generally consistent with the gun used in the shooting.

Mario's wife identified Castillo's SUV as the vehicle involved in the shooting.  When shown a photographic lineup, she said Castillo's photograph looked "a little bit" like the driver.  At trial, Castillo's counsel conceded he was the driver at the time of the shooting.

Officers seized cell phones from Castillo, Castro, and Pasqual.  An analysis of cell tower data placed Castillo and Castro near the crime scene at the time of the shooting and then traveling away from the scene.  They were then stationary together until the next

---

[3]      Castro used catheter bags.

morning. Both Castro's and Pasqual's cell phones contained a phone number for "Directo," Castillo's moniker. And data revealed Castillo called Castro several times the day before and the day of the shooting. In particular, on the day of the shooting, he called Castro at 4:18 p.m. and 4:51 p.m. The shooting occurred between those two calls at 4:39 p.m.

Officers recovered several text messages in Spanish between Castro and his girlfriend Pasqual sent in the hours after the shooting. They were translated as follows (the sender and the time are placed next to each entry, all errors in original):

Castro (6:53 p.m.): "Candy I haven't arrived home we are hiding out bb serious we did some good work we hit Dandy but shush be quiet ok bb it just happened."[4]

Pasqual (8:19 p.m.): "Do NOT dial me, nor cal me nor come over ok you're worth dick ba"

Castro (8:20 p.m.): "Candy if I tell you we killed dandy it's because it's true I swear it on my hood that dog is gone bb"[5]

Pasqual (8:22 p.m.): "Yes but nothing to do with me bb that you can't pee..You know we hardly make the catheter to him"

Castro (8:28 p.m.): "Yes Candy but I did it to him at about 2 candy understand what happened for sure it came for me because I got my vengeance and I know he bb can't pee I'm sorry bb"[6]

Another message Castro sent to Pasqual at 8:28 p.m. said, "I wasn't even expecting this."

Other text messages were extracted from the seized phones. In a conversation between Castro and someone named "Swagg Boy" on August 4, 2012, Castro asked to

---

[4]     The term "bb" was short for "bebe," which means "baby" in Spanish.

[5]     This text message contained the phrase "mostama al dydan," which means nothing in Spanish. The detective who translated the text messages thought it probably meant "matamos al dandy," which translates to "we killed dandy."

[6]     The reference to the catheter and urination referred to Castro and Pasqual's baby boy, who used a catheter due to medical issues.

4

borrow an AK-47 to retaliate against individuals who shot "Necio,"[7] a member of Castro's Bagos clique. In another conversation between Castro and an unknown individual, Castro asked for the "number of your friend who wants to join the hood." The person responded, "So you don't believe me?? O-o .......Oh so I don't think he wants to get involved in that!!" Castro responded, "Fuck stupid bitch go fuck yourself you don't play with the mara I'm going to get information you will see you don't play like I told you." Castro followed up, "You are not going to play with us."

Pasqual, Castro's girlfriend at the time of his arrest, testified he was a gang member with the moniker "Innocente," and he had tattoos related to the MS gang and the Bagos clique. She identified several photographs from her cell phone, including one of an individual known as "Necio" and several of Castro throwing gang signs. She explained she was angry in the text messages with Castro after the shooting because he left the house, not because he said he had hit Mario and was hiding out.

Angel R., a 27-year-old former member of the Bagos clique of MS, testified for the prosecution. He originally got involved in the gang after meeting Mario from the Tiny Winos. He was jumped into the gang when he was 14, and members of both Tiny Winos and Bagos were present at the time. The two cliques were friendly at the time and shared territory, establishing rules for graffiti and "taxing" and "rent" in the area. Angel identified Castro's tattoos as gang-related, which are "earned" by committing crimes for the gang. While Angel was in the gang, he sold drugs and weapons and acted as a lookout during robberies. Angel had moved out of the gang territory, but when he moved back, he ran into two Bagos members in May 2012. Several other Bagos members, including Castillo, went to his home and told him he had to do more "work" for the gang. He refused, and instead he began to pay them money.

He explained that, four or five years before the trial, the cliques developed a dispute over graffiti in the area and how "rent" from the local food carts was to be distributed. He witnessed the shooting in December 2011 that resulted in Castro being paralyzed. A Tiny

---

[7] Necio is also variously spelled as Nexio or Nesio throughout the record.

Winos member known as "Tiny" shot at Castro and another Bagos member. Angel believed this shooting caused a feud between the cliques and resulted in Tiny and Mario, the "shot caller," being "green-lighted," or targeted to be killed by the gang.[8]

At some point later, Castro called Angel and asked for money to pay for his medicine, which Angel paid. On another occasion, Castillo and another gang member went to Angel's home to ask for money, and when Angel refused, Castillo hit him in the head with a gun and said he would return. Angel sold his laptop and paid Castillo the next day. Angel eventually went to the police because he did not have the money to pay the gang. Castro later called Angel and asked for $100, which Angel paid with marked bills from the FBI. On another occasion, Castro told Angel to go to a location where he would be shown a photograph of a person he was supposed to kill. Angel told the police.

Angel identified Castro, Necio, and another gang member throwing MS gang signs in a photograph. He explained any crime committed by gang members benefitted the gang. He also explained members were required to get out of any car before committing a shooting. And he explained he had been green-lighted himself for assisting police.

Officer Raul Salazar testified as a gang expert on the MS gang, including the Tiny Winos and Bagos cliques, their territory in Los Angeles, their hand signs, their graffiti, and their tattoos. The gang's primary activities included murder, attempted murder, assault with deadly weapons, robberies, extortions, sales of narcotics, possession of firearms, and vandalism. The Bagos and Tiny Winos cliques focused on extortions, robberies, sales of narcotics, and assaults with deadly weapons. Certified court records demonstrated members had been convicted of assault with great bodily injury, murder, and attempted murder. Based on police reports, field identification cards, the text messages discussed above, photographs, tattoos, conversations with other gang members, listening to conversations

---

[8]    Detective Carlos Siordia testified he investigated the December 2011 shooting, but a case was never filed because witnesses did not come forward and Castro refused to answer questions. He noted "odd" graffiti at the location of the shooting—graffiti from the Bagos clique had been crossed out and graffiti from the Tiny Winos clique had been spray painted below it.

between gang members, and appellants' incidents with Angel, Officer Salazar opined Castro and Castillo were active members of the Bagos clique of MS.

Officer Salazar corroborated Angel's testimony that the Tiny Winos and the Bagos cliques were historically allies, but a feud developed in 2011 over collection of extortion money, culminating with Castro's shooting in December 2011. The shooting violated gang rules and resulted in the green light on Tiny and Mario. When presented with a hypothetical mirroring the facts of this case, Officer Salazar opined that Mario's murder was committed in association with, at the direction of, and for the benefit of the MS gang.

## DISCUSSION

### 1. *Challenges to First Degree Murder Convictions*

### A. *First Degree Murder Verdict*

The prosecution proceeded on two theories of first degree murder: premeditation; and shooting from a vehicle with the intent to kill. (§ 189.) On separate verdict forms, the jury found each appellant guilty of murder and found true an allegation "that the murder was willful, deliberate and with premeditation." Appellants argue these verdict forms were improper because they did not specify a verdict of *first degree* murder. We disagree.

Pursuant to section 1157, "Whenever a defendant is convicted of a crime or attempt to commit a crime which is distinguished into degrees, the jury . . . must find the degree of the crime or attempted crime of which he is guilty. Upon the failure of the jury . . . to so determine, the degree of the crime or attempted crime of which the defendant is guilty, shall be deemed to be of the lesser degree." For murder, even if a verdict form does not include a numerical degree, section 1157 is satisfied so long as the form contains an express finding that the murder was willful, deliberate, and premeditated, as the verdict forms did in this case. (*In re C.R.* (2008) 168 Cal.App.4th 1387, 1391 ["In murder cases, for instance, a jury verdict that the defendant acted with premeditation and deliberation satisfies Penal Code section 1157, and an express finding of first degree murder is not required."]; see *People v. Nunez and Satele* (2013) 57 Cal.4th 1, 50 [verdict form expressly finding "'willful, deliberate, premeditated murder'" adequate]; *People v. San Nicolas* (2004) 34 Cal.4th 614, 634-635 [verdict form finding defendant guilty of murder and finding he acted "'willfully,

deliberately, and with premeditation'" adequate].) Appellants cite other murder cases finding violations of section 1157, but none involved a verdict form with an express finding that the murder was premeditated, as in *Nunez and Satele* and *San Nicolas*. (See, e.g., *In re Birdwell* (1996) 50 Cal.App.4th 926, 928-930 [murder degree not inferred from special circumstances findings]; *People v. Williams* (1984) 157 Cal.App.3d 145, 153-155 [failure to specify any degree for guilty plea in violation of § 1192, § 1157's counterpart for pleas].) Appellants also argue because the premeditation allegation in the verdict form was phrased in the passive voice, the jury did not find they each *personally* premeditated, so section 1157 was not satisfied. As we discuss below, the jury could not have interpreted the verdict form in this way. Thus, we find no error under section 1157.

*B. Personal Premeditation*

To be convicted of first degree premeditated murder, each perpetrator and aider and abettor must have personally premeditated the murder. (*People v. Chiu* (2014) 59 Cal.4th 155, 166-167.) Appellants argue the jury never made this finding because the premeditation question on the verdict form was phrased in the passive voice and did not expressly specify that each appellant *personally* premeditated. They also argue the instructions did not adequately inform the jury it had to find each appellant personally premeditated. When viewed in the context of the record, however, neither the verdict form nor the instructions permitted the jury to convict appellants of premeditated murder without finding they personally premeditated.[9]

Taking the instructions first, "[i]n reviewing a claim that the court's instructions were incorrect or misleading, we inquire whether there is a reasonable likelihood the jury understood the instructions as asserted by the defendant. [Citation.] We consider the instructions as a whole and assume the jurors are intelligent persons capable of

---

[9]     We reject respondent's contention appellants' failure to object forfeited their challenge to the jury instructions because, if correct, the error would affect their substantial rights. (§ 1259; *People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1331, fn. 2 (*Hernandez*).)

8

understanding and correlating all the instructions." (*Hernandez, supra*, 183 Cal.App.4th at p. 1332.)

Here, in addition to instructing on aiding and abetting principles, the trial court instructed on premeditation as follows: "The defendants are guilty of first degree murder if the People have proved that they acted willfully, deliberately, and with premeditation. The defendants acted willfully if they intended to kill. The defendants acted deliberately if they carefully weighed the considerations for and against their choice and, knowing the consequences, decided to kill. The defendants acted with premeditation if they decided to kill before completing the acts that caused death."

Appellants argue that the "indiscriminate use of the plural" for both defendants in this instruction "allowed jurors to suppose that it was only necessary for one or the other to harbor premeditation." This interpretation is illogical and ignores the record in this case. The use of the plural "defendants" in the instruction did not suggest that only one defendant had to premeditate; rather, it indicated that *both* had to premeditate. This was consistent with the prosecution's arguments in closing that both defendants were gang members who knew there was a green light on Mario, the shooting was an act of revenge, and they premeditated when they drove passed Mario, turned around, and returned to shoot him to death. According to the prosecution's theory, Castillo was the driver who personally intended to kill Mario with premeditation and deliberation when he turned his car around and returned to Mario so Castro could shoot him, and Castro was most likely the shooter who got his "vengeance" by killing Mario.

Appellants point to several other instructions to argue the premeditation instruction was confusing, but we are not convinced. The premeditation instruction using the plural "defendants" was not confusing when read next to the instruction on shooting from a vehicle with the intent to kill, which used the singular "defendant" to explain that "[t]he defendant is guilty of first degree murder if the People have proved that the defendant murdered by shooting a firearm from a motor vehicle." This was accurate based on the evidence and arguments at trial that there was only one shooter. In any case, this instruction would have had no impact on the jury's premeditation finding because the jury was not required to find

9

premeditation to convict appellants for first degree murder of shooting from a vehicle with the specific intent to kill. (*People v. Chavez* (2004) 118 Cal.App.4th 379, 386.) For similar reasons, the instruction on the elements for the gang enhancement using the singular "defendant" would not have confused the jury as to the separate personal premeditation requirement for the first degree murder charge. Finally, as discussed below, we reject appellants' argument that the instructions were misleading by failing to state explicitly that premeditation required specific intent.

Appellants also focus on the fact that an aider and abettor may be convicted of *attempted* premeditated murder even if he or she does not personally premeditate, so long as another perpetrator did. (*People v. Lee* (2003) 31 Cal.4th 613, 624.) That principle is beside the point because nothing in the testimony, arguments, or instructions raised any possibility of *attempted* murder. For that reason, *People v. Concha* (2009) 47 Cal.4th 653— a case involving both murder and attempted murder—is distinguishable. (*Id.* at pp. 665-666.)

As for the verdict form, when viewed against this record, the passive voice phrasing of the premeditation finding on the verdict form created no reasonable possibility of misleading the jury. The evidence and instructions gave the jury only two options—finding each defendant *personally* premeditated or rejecting premeditation entirely. While an active voice construction of the question would have undoubtedly avoided the arguments appellants raise now, the jury's true findings demonstrated its conclusion that each defendant personally premeditated. Thus, appellants were properly convicted of premeditated first degree murder.

## C. *Premeditation and Specific Intent*

The trial court instructed the jury that the firearm allegations required general intent, whereas the murder count and the gang allegation required specific intent, specifically "that person must not only intentionally commit the prohibited act, but must do so with a specific intent. The act and specific intent required are explained in the instruction for that crime

10

and allegation." The court did not expressly instruct the jury that the premeditation allegation required specific intent, which appellants claim was error.[10]

We find neither error nor prejudice. There was no error because the instructions expressly stated that murder required specific intent, to be defined in the later substantive instructions. The later instructions on murder explained that murder was in the second degree unless the jury found beyond a reasonable doubt it was in the first degree as defined in CALCRIM No. 521. CALCRIM No. 521 in turn defined first degree murder in two ways: (1) if it was committed willfully, deliberately, and with premeditation, as those terms were defined in the instruction; or (2) if it was committed by shooting from a vehicle with the specific intent to kill. This was sufficient to inform the jury that premeditation required specific intent and no reasonable jury would have been misled otherwise. (Cf. *People v. Alvarez* (1996) 14 Cal.4th 155, 220 [error to exclude murder count entirely from standard instruction on concurrence of act and specific intent].) Even if this were error, it was patently harmless because the court precisely defined what constituted willful, deliberate, and premeditated murder, so the jury clearly understood the mental state required to find premeditated first degree murder. (*Ibid.* [error harmless because substantive instructions defined mental state required for murder and premeditation].)

## 2. *Evidence of Prior Gang-related Crimes and Acts*

### A. *Admission of Gang-related Prior Acts*

Appellants argue the trial court abused its discretion and violated their constitutional rights by admitting evidence of their prior gang-related crimes and acts. Castillo challenges the admission of his acts to extort money from Angel and hitting him with a gun when he refused to pay. Castro challenges the admission of the text messages to "Swagg Boy" asking for the AK-47 to retaliate against individuals who shot a fellow gang member, the text messages about recruiting a new gang member, and his demand that Angel kill a rival gang member. We find no error.

---

[10] Again, respondent argues appellants' failure to object forfeited this contention, but again, we find no forfeiture because, if correct, the error would affect their substantial rights. (§ 1259; *Hernandez, supra*, 183 Cal.App.4th at p. 1331, fn. 2.)

### i. Background

In the trial court, appellants objected to introduction of the extortion-related acts with Angel as irrelevant and unduly prejudicial. The prosecutor argued the evidence was relevant to Angel's credibility, to show a gang-related retaliatory motive for the shooting, and to prove the gang enhancement. The court overruled the objections, finding the evidence probative of both motive and the gang enhancement, although the court precluded the parties from referring to the extortion case pending against Castro.

Similarly, Castro objected to the admission of the AK-47 and recruiting text messages on the grounds they were irrelevant and unduly prejudicial. The prosecutor argued the AK-47 texts were relevant to show Castro was an active gang member, even though he had suggested to officers he was not because he was in a wheelchair. She argued the recruitment texts were relevant to the gang allegation and they were not unduly prejudicial because they were the only evidence of Castro recruiting other members. The court admitted the texts because they were relevant to the gang enhancements and more probative than prejudicial.

### ii. Analysis

Evidence of uncharged crimes or other acts is not admissible to prove a defendant's criminal disposition, but it may be admitted to prove facts relevant to the charged crime, such as motive. (Evid. Code, § 1101, subds. (a)-(b).) While motive is not usually an element of a crime, "'evidence of motive makes the crime understandable and renders the inferences regarding defendant's intent more reasonable.'" (*People v. Riccardi* (2012) 54 Cal.4th 758, 815, overruled on other grounds by *People v. Rangel* (2016) 62 Cal.4th 1192, 1216 (*Rangel*).) Courts have repeatedly recognized that gang evidence can be relevant to motive: "Gang evidence is relevant and admissible when the very reason for the underlying crime, that is the motive, is gang related. [Citation.] '"[B]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence."'" (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1167-1168 (*Samaniego*); see *People v. Valdez* (2012) 55 Cal.4th 82, 130-131 (*Valdez*) [gang rivalry motive]; *People v. McKinnon* (2011)

12

52 Cal.4th 610, 655 [motive and intent]; *People v. Williams* (1997) 16 Cal.4th 153, 193-194 (*Williams*) [motive and identity].)

"[T]he admissibility of uncharged crimes depends upon three factors: (1) the materiality of the facts sought to be proved; (2) the tendency of the uncharged crimes to prove or disprove the material fact (i.e., probative value); and (3) the existence of any rule or policy requiring the exclusion of relevant evidence (i.e., prejudicial effect or other [Evid. Code,] § 352 concern). [Citations.] [¶] Courts subject other crimes evidence to "'extremely careful analysis'" [citation] and review the admission of such evidence for abuse of discretion [citation]." (*People v. Hendrix* (2013) 214 Cal.App.4th 216, 238.)

The evidence of appellants' acts related to Angel and Castro's text messages was highly probative of both the gang allegation and the motive for Mario's murder. It resembles gang evidence found probative in other gang cases. (See, e.g., *Valdez, supra*, 55 Cal.4th at p. 131 [gang tattoos and photographs showing "membership in and level of commitment to" gang was probative of retaliatory gang motive].) It demonstrated appellants were active members of the MS gang who engaged in violent activities and recruitment efforts to promote the gang in accordance with gang rules and guidelines. It also supported the retaliatory motive and premeditation for Mario's shooting and corroborated Angel's testimony that Mario had a "green light" and gang members would be required to kill him for that reason. The AK-47 texts in particular corroborated Castro's motive in retaliating against Mario, given he had sought to retaliate against someone else previously.

Appellants argue this evidence was nonetheless irrelevant because their gang membership was undisputed and other evidence conclusively demonstrated they were gang members. Even though they might not have disputed their gang membership, "'the prosecution may not be compelled to accept a stipulation where the effect would be to deprive the state's case of its persuasiveness and forcefulness.'" (*Valdez, supra*, 55 Cal.4th at p. 130.) In any case, this evidence proved far more than they were simply gang members—it showed they were *active* gang members engaged in acts at the direction of and in furtherance of the gang. And this evidence was not cumulative because the other gang

13

testimony was not nearly as powerful as direct testimony from Angel, a former member of the same gang, about appellant's acts against him in furtherance of the gang, and text messages directly from Castro showing his specific acts in furtherance of his gang's activities.

Appellants also argue the trial court erred because it admitted this evidence to show appellants were "active" gang members, which is not an element of the gang enhancement. They are correct active participation in a gang is not an element of the gang enhancement in section 186.22, subdivision (b). (*In re Ramon T.* (1997) 57 Cal.App.4th 201, 207.) But the record does not demonstrate the court misunderstood this or premised the admission of this evidence on the ground that the prosecution was *required* to show appellants were "active" gang members.[11] Moreover, appellants' status as active gang members was highly probative of several issues: it helped explain Angel's testimony that when he moved back to the area he was still considered a member of the gang, even though he had not been "active" since he moved away; it rebutted Castro's suggestion to police that he was not the shooter because he was in a wheelchair; and it showed appellants' retaliatory motive to kill Mario and showed the shooting was for the benefit of, at the direction of, and in association with the gang.

The trial court also properly concluded the probative value of this evidence was not outweighed by the risk of undue prejudice. As we have explained, it was highly probative of motive, credibility, and the gang allegation. Conversely, there was minimal risk of undue prejudice because it paled in comparison to the violent driveby retaliatory shooting and Castro's text messages essentially confessing to the murder and his revenge motive. It was also presented alongside Angel's, Pasqual's, and Officer Salazar's testimony regarding appellants' gang membership and activities, creating little risk that the jury would place undue weight on it or use it to improperly infer appellants simply had bad character or a

---

[11]     The prosecutor argued for admission of the AK-47 texts on the ground Castro was an "active member of this gang who is acting as a shooter for the gang." The prosecutor also argued to the court Castro's recruitment texts showed "his ongoing active participation" in the gang. The court seemed to accept the prosecutor's theory, but never suggested that active participation was required for the gang enhancement.

14

propensity to commit crimes. And to ensure the jury did not draw such a conclusion, the court instructed the jury to consider all gang evidence only for the limited purposes of the gang allegation and to prove intent, purpose, knowledge, motive, and credibility, and not to conclude appellants had bad character or dispositions to commit crimes.[12]

## B. *Prosecutorial Misconduct*

Castro argues the prosecutor committed misconduct and violated his constitutional rights by urging the jury in closing argument to rely on his acts related to Angel and his AK-47 and recruiting text messages to find he had a propensity to commit crimes. The challenged passage is as follows (the pertinent comments are italicized):

"I want to talk to you about the shooter. What makes most sense about who the shooter would have been in this case. We've addressed the descriptors, right, the blue bandanna[,] the arm out the window, only one window is down. Obviously they're not going to be firing through a closed window. And if they had, there would be evidence of it like shattered glass. But it just wouldn't make sense, right. These are active gang members. Think about who Mr. Castro is. Mr. Castro isn't just an active gang member, he has text messages that you saw about an hour before this incident where he's actively trying to recruit people to his gang. The text messages that he says to someone saying, hey, what's the name of that person who's interested in joining the hood. And when the reply is oh . . . they change[d] their mind, [vile] threats about you don't mess with the hood. That's an hour before. *That is who this individual is.*

"What else do you know about Mr. Castro. You know that this is an individual who has purposefully sought out Angel to kill rivals. You know that this is an individual who sends another set of text messages on August 4th within the same month of the shooting of

---

**12** Castro argues the risk of undue prejudice was particularly high because his AK-47 and recruitment text messages bore similarities to the current retaliatory murder. But the only true similarity was the retaliation aspect of the texts, which is precisely why they were highly probative of his retaliatory motive in shooting Mario. Thus, there was no *undue* prejudice in admitting the text messages. Castro also argues the prosecutor used this evidence in closing argument to argue he had a criminal propensity. As we will explain in the context of appellants' prosecutorial misconduct claim, the jury would not have understood the prosecutor's comments in this way.

15

Dandy specifically saying that he needs an AK-47 in order to carry out retaliation because Nexio, one of his homies, that his house got shot up. He's not just active. If you want to think to yourself is there any evidence that anyone in that car has—is *the kind of person that would be an active shooter for the gang* there's only one and it's Mr. Castro. Is it any surprise to you that same person who's seeking out an AK-47 to retaliate for Nexio is going to be the same person who is going to be actively shooting another MS gang member whose [*sic*] green lit who happens to be in his mind affiliated with putting him in a wheelchair. He has the most motive and you have evidence that Mr. Ivan Castro the defendant is an active violent person in this gang who is very much interested in retaliation, is very much at the helm of trying to get retaliation, of trying to get firearms, of trying to get rivals shot."

"'A prosecutor commits misconduct when his or her conduct either infects the trial with such unfairness as to render the subsequent conviction a denial of due process, or involves deceptive or reprehensible methods employed to persuade the trier of fact.' [Citation.] 'As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.' [Citation.] 'When attacking the prosecutor's remarks to the jury, the defendant must show' that in the context of the whole argument and the instructions there was '"a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner."'" (*Rangel, supra*, 62 Cal.4th at p. 1219.)

Castro did not object to the prosecutor's comments, so he has forfeited this claim. (*Rangel, supra*, 62 Cal.4th at p. 1219.) We disagree with him that an objection would have been futile or that an admonition would not have cured the alleged harm. (*People v. Clark* (2011) 52 Cal.4th 856, 960.) To avoid forfeiture, he argues his counsel was ineffective for failing to object. Because his claim fails on the merits, his counsel was not ineffective. (*Samaniego, supra*, 172 Cal.App.4th at p. 1170.)

Although the prosecutor's comments could have been somewhat misleading in isolation, in context there was no reasonable likelihood the jury would have interpreted them as suggesting Castro had a criminal disposition. The comments came in the midst of the

16

prosecutor's argument that Castro was the shooter and had a strong retaliatory motive to kill Mario, which was entirely consistent with Castro's prior acts of asking for an AK-47 for a separate act of retaliation, threatening a potential recruit, and directing Angel to kill a rival. Further, as noted above, the jury was instructed that the prior act evidence could only be considered for the limited purpose of proving the gang allegation and motive, intent, purpose, and knowledge for the murder count, and could not be considered for any other purpose. On this record, the jury would not have interpreted the prosecutor's comments as suggesting it should convict Castro merely because he had a criminal propensity.

## 3. *Firearms Evidence*

Police never recovered the firearm used in Mario's shooting, but the prosecution offered various firearms-related items of evidence, including: (1) photographs showing Castro sitting in his wheelchair brandishing a semiautomatic handgun; (2) testimony that officers recovered .38-caliber bullets, .22-caliber bullets, and a cylinder for a .38-caliber revolver from Castro's residence; (3) testimony that officers found a loaded .38-caliber revolver and additional bullets under the rear seat of Castillo's SUV; and (4) Castro's text messages asking for an AK-47 to use in a retaliatory shooting. Over appellants' relevance and prejudice objections before and during trial, the court admitted this evidence.[13]

Appellants argue this evidence was improper character evidence and the trial court abused its discretion and violated their constitutional rights in admitting it. For reasons already explained above, we find Castro's text messages involving the request for an AK-47 were properly admitted and the same analysis applies here. We find the remaining evidence was also properly admitted.

As with all evidence, the trial court has broad latitude to determine the relevance of firearm evidence, and we review the court's decision for abuse of discretion. (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1073 (*Nguyen*).) "When the prosecution relies on evidence regarding a specific type of weapon, it is error to admit evidence that other weapons were

_____

[13] Castro did not expressly object to the evidence of the cylinder and ammunition found in his house, but respondent does not argue the issue was forfeited, so we will consider it on the merits.

17

found in the defendant's possession, for such evidence tends to show not that he committed the crime, but only that he is the sort of person who carries deadly weapons." (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1056.) But possession of firearms and other firearm-related evidence may be admitted if the weapon used in the crime is unknown, and the evidence sought to be admitted may be connected to the crime or relevant to the crime in some other way. (*People v. Cox* (2003) 30 Cal.4th 916, 956 (*Cox*) [firearms evidence admissible because victims' cause of death was unknown and guns might have been used to coerce or subdue victims], disapproved on other grounds by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *People v. Carpenter* (1999) 21 Cal.4th 1016, 1052 [firearm evidence admissible when it might have been murder weapon].) In one gang murder case, our high court held firearms unrelated to the crime were admissible to prove the defendant "was a gang member at war with a rival gang." (*Nguyen, supra*, at p. 1073 [no abuse of discretion to admit firearms found in vehicle and house linked to the defendant but not linked to shootings].)

The trial court did not abuse its discretion in admitting the firearm-related evidence here. As noted, the murder weapon was never found. Because the bullets recovered from Mario's body could have been fired from a .38-caliber gun, the .38-caliber interchangeable cylinder found in Castro's residence and the .38-caliber ammunition found in his residence and in Castillo's SUV could have been connected to the murder weapon. The semiautomatic handgun Castro was holding in the photographs also could not be ruled out as the murder weapon, although the prosecutor argued to the jury the murder weapon was most likely a revolver because no shell casings were found at the scene. (See *Cox, supra*, 30 Cal.4th at p. 956 [firearms evidence relevant as possible murder weapons "[a]lthough the prosecutor argued that the evidence pointed to a stabbing"].)

While the .38-caliber revolver found in Castillo's SUV was ruled out as the murder weapon, both that gun and the .22-caliber ammunition found in Castro's residence were relevant to motive, premeditation, and the gang allegation. Similar to the gang war in *Nguyen*, Mario had been green-lighted by the MS gang for his involvement in the shooting that left Castro paralyzed. The presence of a gun in Castillo's SUV that was potentially

18

similar to the one used in Mario's shooting showed appellants had access and opportunity to arm themselves in order to retaliate against Mario should they spot him. Similarly, in light of the gun in Castillo's SUV, the jury could have interpreted Castro's text message to Pasqual that he "didn't even expect this" to mean they were driving in the area armed as part of a plan to shoot Mario if they could catch him in a vulnerable situation. (See *People v. Jablonski* (2006) 37 Cal.4th 774, 821-822 [wire handcuffs and stun gun found in defendant's vehicle but not used in murders admissible because "premeditation was a disputed fact and evidence that defendant carried devices to the crime scene that could have been used to restrain or immobilize the victims was relevant to premeditation"].) The .22-caliber ammunition suggested Castro might have had other firearms and was willing to arm himself in order to carry out the green light on Mario, exacting his revenge for the prior shooting that left him paralyzed. And both the revolver and .22-caliber ammunition corroborated the gang expert's testimony that one of the primary activities of the MS gang was firearm possession.

Nor was the probative value of this evidence substantially outweighed by any risk of undue prejudice. Any impact of this firearm evidence was mitigated by other evidence linking appellants to firearms, including evidence that appellants had at least one loaded gun in Castillo's SUV when they spotted Mario, turned around, and drove back to shoot and kill him. Angel also testified that Castillo hit him with a gun when he refused Castillo's demands for money. Thus, there was little risk the jury would have merely inferred from the challenged firearm evidence that appellants were the type of people to carry dangerous weapons. (See *Nguyen, supra*, 61 Cal.4th at p. 1073 [no undue prejudice from admission of firearms evidence in light of "a significant amount of other evidence linking defendant to firearms"].)

## 4. *Confrontation Clause and Hearsay Challenges to Gang Expert and Informant Testimony*

Appellants contend the trial court violated state hearsay rules and the confrontation clause by allowing Officer Salazar, the prosecution's gang expert, and Angel to testify about the feud between the Bagos and Tiny Winos cliques and the green light on Mario because

19

they learned that information from other gang members. We find no error in admitting Angel's testimony about the green light on Mario. We find error in admitting his testimony about the feud, but conclude the error was harmless. We also find error in allowing Officer Salazar to testify about both the feud and green light, which was inadmissible case-specific hearsay under the recently decided *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*), but we find the error harmless as well.

## A. Angel R.'s Testimony—Hearsay

Angel testified he had attended gang meetings during which the Bagos/Tiny Winos dispute was discussed, which he personally knew occurred four or five years prior to trial and involved rents and graffiti in the territory.[14] He had also personally witnessed the shooting in December 2011 that left Castro paralyzed. When asked if he knew whether the feud was still ongoing when Castro was shot, he said yes. But he testified he was not attending meetings at that time, so he knew because "a member of the gang explained it to" him. The court overruled a hearsay objection because "[t]he statement in and of itself is not hearsay." The prosecutor then asked: "Now, after [Castro] was shot, did you receive—did you as a member of the Bagos receive any instructions as to someone being green lit?" He replied, "Yes." The court sustained a hearsay objection. The prosecution rephrased the question: "I am not asking what you were told. My question is, did you receive any instruction indicating that someone had been green lit after [Castro] was shot?" He responded, "Yes." He explained the green light was discussed among his clique in his presence. He explained the green light meant that someone would be killed, and the cliques would have a meeting to discuss whether a green light should be given. He was asked, "And after [Castro] was shot, who did you understand to be green lit?" Castro's counsel objected as hearsay, and the prosecutor responded that the statement was "not offered for

---

**14**     On cross-examination, he was asked if he remembered what vendors the rent dispute arose from, and he said no. He was asked, "Did you attend any meetings where this was discussed?" He replied, "No." He was then asked, "Who did you hear from who stated that this was the reason for the feud?" He said, "Bandi told me." This created some ambiguity with his testimony, but did not negate his specific statements on direct that he had personal knowledge of the feud and attended meetings when it was discussed.

20

the truth. It is offered for this witness's state of mind." The court overruled the objection without explanation. Angel testified he understood Mario to have been green lit. Because Angel was a member of the Bagos clique, that meant if he were to see Mario, he should kill him.

Appellants contend Angel's testimony that the feud between the cliques was ongoing at the time of the December 2011 shooting and that Mario had been green lit was inadmissible hearsay. "[A] hearsay statement is one in which a person makes a factual assertion out of court and the proponent seeks to rely on the statement to prove that assertion is true." (*Sanchez, supra*, 63 Cal.4th at p. 674.) Hearsay is inadmissible unless it falls within an exception. (*Ibid.*; Evid. Code, § 1200, subd. (b).) We review the trial court's application of hearsay rules for abuse of discretion. (*People v. Clark* (2016) 63 Cal.4th 522, 590 (*Clark*).)

The court properly admitted Angel's testimony about the green light on Mario because it was an instruction not offered for the truth of any fact asserted. The prosecution's gang expert Officer Salazar explained that a green light was a specific instruction to kill an individual, and Angel testified the green light on Mario was a directive among his clique to kill him if they saw him. So when Angel testified his gang issued a green light on Mario, it was "'verbal conduct consisting of a directive that was neither inherently true nor false.'" (*Clark, supra*, 63 Cal.4th at p. 592.) "Because a request, by itself, does not assert the truth of any fact, it cannot be offered to prove the truth of the matter stated." (*People v. Jurado* (2006) 38 Cal.4th 72, 117 [collecting cases]; see *People v. Curl* (2009) 46 Cal.4th 339, 361-362 [command to "'get rid'" of a pair of boots verbal conduct and not hearsay] .) Indeed, the probative value of the green light was the fact that it was issued among appellants' Bagos clique, which showed appellants' gang motive behind Mario's murder and showed the shooting was committed at the direction of the gang as required for the gang allegation.

Appellants argue our review of the admission of the green light testimony is limited to the nonhearsay state-of-mind rationale the prosecutor cited in response to Castro's counsel's hearsay objection. The court did not cite that reason for overruling the objection,

21

and even if it had, "[i]f a judgment rests on admissible evidence it will not be reversed because the trial court admitted that evidence upon a different theory, a mistaken theory, or one not raised below." (*People v. Brown* (2004) 33 Cal.4th 892, 901.) We reject appellants' argument that this principle does not apply because the "'new theory was not supported by the record made at the first hearing and would have necessitated the taking of considerably more evidence, [or appellants] had no notice of the new theory and thus no opportunity to present evidence in opposition.'" (*Ibid.*) Appellants had ample opportunity to inquire as to Angel's personal knowledge of the green light, and they point to no additional testimony they would have elicited if the prosecution had argued the green light was admissible as a nonhearsay directive.

We agree with appellants, however, that Angel's specific testimony about the existence of the feud at the time of the December 2011 murder was inadmissible hearsay because it was based on an out-of-court statement offered to show the feud continued to exist at that time. But the error was harmless under *People v. Watson* (1956) 46 Cal.2d 818, 836-837. First, this hearsay testimony was extremely limited. Angel testified to his personal knowledge that the feud existed four or five years before trial. He also personally witnessed the December 2011 shooting. His objectionable testimony merely linked those two facts to establish the feud was continuing at that time. Even if that specific testimony had been excluded, the jury could still have inferred the feud was ongoing and motivated the shooting that left Castro paralyzed. Moreover, the testimony about the feud merely provided background and context for the key event in this case—the driveby shooting eight months later that resulted in Mario's murder. Angel's admissible testimony that Mario was green-lighted after the December 2011 shooting strongly supported the prosecution's theory that the driveby shooting was gang-motivated and gang-related, so Angel's specific testimony that the feud continued at the time of the December 2011 shooting added little to the prosecution's case. Thus, the erroneous admission of Angel's hearsay testimony would have had no impact on the jury's verdict.[15]

_____

[15] For the first time in their supplemental briefs after we granted rehearing in this case in light of *Sanchez,* appellants argued Angel's hearsay testimony was subject to the

*B. Officer Salazar's Testimony—Hearsay and Confrontation Clause*

Officer Salazar testified "a good three quarters" of his job was to obtain information about the Bagos and Tiny Winos cliques from gang members. In the course of those duties, he had regular custodial and noncustodial interactions with members of the Tiny Winos and Bagos cliques. Through speaking to gang members, he learned a feud developed between the two cliques in 2011 over the collection of extortion money. Also through gang members and through investigating crimes committed by members of the cliques, he learned the feud resulted in the shooting in December 2011 that left Castro paralyzed, which violated gang rules. Based on reviewing reports of the shooting, speaking with officers involved in the investigation, and speaking with gang members, he concluded the suspected shooter was Tiny from the Tiny Winos clique. And based on conversations with gang members and with officers and detectives involved in the investigation, he learned a green light had been placed on Tiny and Mario, the shot caller, for not turning Tiny over to the gang for discipline.

Appellants claim Officer Salazar's testimony violated both state hearsay rules and the confrontation clause under our high court's recent decision in *Sanchez*. Respondent argues appellants forfeited their confrontation clause claim by failing to object in the trial court. It is true appellants never objected to any of Officer Salazar's testimony on confrontation clause grounds, which would normally result in forfeiture of the claim on appeal. (*People v. Redd* (2010) 48 Cal.4th 691, 730 (*Redd*).) But an objection here would have been futile given the state of law at the time of trial, which would have compelled the trial court to overrule any confrontation clause objection. Under *Crawford, supra*, 541 U.S. 36, the confrontation clause is only implicated when out-of-court testimonial statements are offered for their truth. (*People v. Valadez* (2013) 220 Cal.App.4th 16, 30.) In light of *Crawford*, several courts had relied on *People v. Gardeley* (1996) 14 Cal.4th 605, to hold expert

confrontation clause under *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*) because he was working as an informant starting in March 2012, five months before Mario's murder. We need not decide this issue because any error was harmless beyond a reasonable doubt for the same reasons cited above. (*Sanchez, supra*, 63 Cal.4th at p. 698.)

"basis" evidence is not offered for its truth, and hence not subject to the confrontation clause. (See *Valadez, supra*, at p. 30, and cases cited therein.) The court in *Sanchez* disapproved of this aspect of *Gardeley* and other cases relying on it. (*Sanchez, supra*, 63 Cal.4th at p. 686, fn. 13.) Thus, any objection would have been futile and appellants have not forfeited their confrontation clause claim.[16] (See *Rangel, supra*, 62 Cal.4th at pp. 1215-1216.)

In *Sanchez*, our high court considered the extent to which *Crawford* limits an expert witness from relating case-specific hearsay in explaining the basis for an opinion, and it clarified the application of state hearsay rule to that kind of expert testimony. It held the case-specific out-of-court statements conveyed by the prosecution's gang expert as basis evidence constituted inadmissible hearsay under state law and, to the extent it was testimonial, ran afoul of *Crawford*. (*Sanchez, supra*, 36 Cal.4th at pp. 670-671.)

Under *Crawford* and the confrontation clause, a hearsay statement is inadmissible unless it falls within an exception recognized at the time of the Sixth Amendment's adoption or the declarant is unavailable to testify and the defendant had a previous opportunity for cross-examination or that opportunity was forfeited. (*Sanchez, supra*, 63 Cal.4th at p. 680.) Thus, a court's task in evaluating out-of-court statements under hearsay rules and *Crawford* is two-fold: "The first step is a traditional hearsay inquiry: Is the statement one made out of court; is it offered to prove the truth of the facts it asserts; and does it fall under a hearsay exception? If a hearsay statement is being offered by the prosecution in a criminal case, and the *Crawford* limitations of unavailability, as well as cross-examination or forfeiture, are not satisfied, a second analytical step is required. Admission of such a statement violates the right to confrontation if the statement is *testimonial hearsay*, as the high court defines that term." (*Sanchez, supra*, 63 Cal.4th at p. 680.)

On the state-law question, the court drew a line between an expert's testimony as to general background information and case-specific facts. Traditionally, "an expert's testimony concerning his general knowledge, even if technically hearsay, has not been

---

**16**    Because we find no forfeiture, we need not address appellants' alternative argument that the failure to object constituted ineffective assistance of counsel.

subject to exclusion on hearsay grounds," but experts have not been permitted to convey case-specific hearsay about which the expert has no personal knowledge. (*Sanchez, supra,* 63 Cal.4th at p. 676.) The court defined case-specific facts as "those relating to the particular events and participants alleged to have been involved in the case being tried." (*Ibid.*) An expert may "testify about more generalized information to help jurors understand the significance of those case-specific facts. An expert is also allowed to give an opinion about what those facts may mean. The expert is generally not permitted, however, to supply case-specific facts about which he has no personal knowledge." (*Ibid.*) The court gave several examples of this distinction, one of which pertains directly to gang experts: "That an associate of the defendant had a diamond tattooed on his arm would be a case-specific fact that could be established by a witness who saw the tattoo, or by an authenticated photograph. That the diamond is a symbol adopted by a given street gang would be background information about which a gang expert could testify. The expert could also be allowed to give an opinion that the presence of a diamond tattoo shows the person belongs to the gang." (*Id.* at p. 677.)

Courts frequently avoided any confrontation issues with this kind of expert basis evidence by "concluding that statements related by experts are not hearsay because they 'go only to the basis of [the expert's] opinion and should not be considered for their truth.'" (*Sanchez, supra,* 63 Cal.4th at pp. 680-681.) The court disapproved of this reasoning when the expert relates case-specific facts as a basis for his or her opinions: "If an expert testifies to case-specific out-of-court statements to explain the bases for his opinion, those statements are necessarily considered by the jury for their truth, thus rendering them hearsay. Like any other hearsay evidence, it must be properly admitted through an applicable hearsay exception. Alternatively, the evidence can be admitted through an appropriate witness and the expert may assume its truth in a properly worded hypothetical question in the traditional manner." (*Id.* at p. 684, fn. omitted.) Because this testimony is hearsay, it implicates *Crawford* and the confrontation clause if the statements are also testimonial and none of *Crawford*'s exceptions apply. (*Sanchez,* at p. 685.)

25

The court thus crafted the following rule: "When any expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay. It cannot logically be maintained that the statements are not being admitted for their truth. If the case is one in which a prosecution expert seeks to relate *testimonial* hearsay, there is a confrontation clause violation unless (1) there is a showing of unavailability and (2) the defendant had a prior opportunity for cross-examination, or forfeited that right by wrongdoing." (*Sanchez, supra*, 63 Cal.4th at p. 686, fn. omitted.)

Applying these rules, the court found most of the case-specific basis evidence cited by the gang expert was hearsay and testimonial, violating the confrontation clause. First, the expert testified to five prior police contacts with the defendant, three of which were based on police reports compiled by the investigating officers during the investigations of those crimes and not admitted into evidence. These types of "statements about a completed crime, made to an investigating officer by a nontestifying witness . . . are generally testimonial unless they are made in the context of an ongoing emergency . . . or for some primary purpose other than preserving facts for use at trial." (*Sanchez, supra*, 63 Cal.4th at p. 694.) It did not matter that the officer summarized the statements or that the defendant himself was not accused of the crimes. (*Id.* at pp. 694-695.) Second, the expert testified the defendant was a gang member based on the content of a sworn STEP[17] notice retained by police, which recorded the defendant's biographical and other information. This notice was testimonial because it was a formal sworn statement from a police officer that the information was accurate, and its primary purpose was collecting information for later use at trial. (*Sanchez*, at p. 696.) Finally, the expert relayed statements from a field identification card memorializing a contact with the defendant. The expert's testimony was unclear and confusing on this issue, but "[i]f the card was produced in the course of an ongoing criminal investigation, it would be more akin to a police report, rendering it testimonial." (*Id.* at p. 697.) The court found the confrontation clause violation prejudicial as to the gang

---

[17]    This acronym is a reference to the California Street Terrorism Enforcement and Prevention Act. (Pen. Code, § 186.20 et seq.; *Sanchez, supra*, 63 Cal.4th at p. 672, fn. 3.)

26

enhancements because the main evidence of the defendant's intent to benefit the gang was the expert's recitation of testimonial hearsay. (*Id.* at p. 699.)

Applying *Sanchez* here, Officer Salazar's testimony relaying out-of-court statements from gang members about the feud between the Bagos and Tiny Winos, the December 2011 shooting that left Castro paralyzed, and the resulting green light on Mario was case-specific hearsay offered for its truth. Those facts were case-specific because they pertained directly to the shooting at issue in this case and appellants' possible motive for Mario's murder, rather than general background information about the gang. The jury necessarily had to believe these out-of-court statements in order to properly evaluate Officer Salazar's opinions that Mario's murder was gang-motivated and gang-related. (*Sanchez, supra*, 63 Cal.4th at p. 682 ["When an expert relies on hearsay to provide case-specific facts, considers the statements as true, and relates them to the jury as a reliable basis for the expert's opinion, it cannot logically be asserted that the hearsay content is not offered for its truth."].)[18]

Respondent contends Officer Salazar's testimony was proper because the hearsay statements he conveyed to the jury were independently proven by other evidence in the case, such as Angel's testimony. Respondent is correct that, under *Sanchez*, case-specific hearsay evidence "can be admitted through an appropriate witness and the expert may assume its truth in a properly worded hypothetical question in the traditional manner." (*Sanchez, supra*, 63 Cal.4th at p. 684; see *id.* at p. 686 ["What an expert *cannot* do is relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception."].) But that is not what happened here. Even though there was other evidence of the feud, the December 2011

---

**18** Unlike Angel's testimony, Officer Salazar's testimony relaying statements to him from gang members about the green light on Mario was offered for its truth. Angel was a member of the Bagos clique, so his testimony about the green light was a nonhearsay directive to him personally to kill Mario if he saw him. Because Officer Salazar was an outsider, his testimony that he was told the green light existed asserted a fact that could be true or false—the existence of the green light. Thus, the only relevance of this out-of-court statement to Officer Salazar was that the green light on Mario had, in fact, been issued.

27

shooting, and the green light on Mario, Officer Salazar did not *assume* those facts were true to give his opinions; instead, he *presented* those facts as true. While Angel's testimony and the other evidence in this case ultimately demonstrates any error was harmless as we discuss below, we cannot fairly characterize this evidence as independently proving facts that Officer Salazar merely assumed were true in order to give his opinions.

The closer question is whether the statements at issue were testimonial. Officer Salazar obtained these statements from gang members during police investigations, and at least some of these gang members were in custody when Officer Salazar interviewed them. He also reviewed police reports of the December 2011 shooting, which were not offered into evidence. His "primary purpose" in obtaining this information during the course of criminal investigations may have been to preserve their use for a later trial. (*Sanchez, supra*, 63 Cal.4th at p. 694.) But we have few details about the formality of these police reports or interactions, unlike the detailed testimony the expert gave in *Sanchez* based on the police reports, sworn STEP notice, and field identification card involving the defendant.

In any case, we need not decide this issue. Even if Officer Salazar's case-specific testimony violated appellants' confrontation rights, we find the error harmless beyond a reasonable doubt. (*Sanchez, supra*, 63 Cal.4th at p. 698.) Officer Salazar properly established the Bagos clique's primary activities included violent crimes and murder and appellants were active members of the clique. There was also evidence they committed specific violent acts against Angel at the direction of and for the benefit of the gang. Further, as discussed above, Angel testified to the existence of the feud between the Bagos and Tiny Winos clique, as well as the December 2011 shooting that left Castro paralyzed and resulted in the green light on Mario. His only inadmissible testimony was that the feud was ongoing at the time of the December 2011 shooting, which was a minor detail that the jury could have inferred from the testimony that was properly admitted. In light of Angel's testimony, Officer Salazar's recitation of case-specific hearsay was duplicative.

We reject appellants' contention that credibility issues with Angel's testimony undermined its persuasiveness, given there was significant other evidence to corroborate it. Graffiti from the Bagos clique had been crossed out and graffiti from the Tiny Winos clique

28

had been spray painted below it, suggesting the existence of the feud. Perhaps most significant, in the text messages Castro sent to his girlfriend, he wrote, "we did some good work we hit Dandy [i.e., Mario]." The jury could have inferred the "we" meant Castillo and other members of the Bagos clique, and Officer Salazar testified that "putting in work" meant committing acts of violence for the gang, all of which supported the gang motive for the shooting. In light of this evidence and Angel's testimony, no reasonable jury would have acquitted appellants of first degree murder or found the gang allegations untrue if Officer Salazar's case-specific testimony had been excluded. This significant additional evidence distinguishes this case from *Sanchez*. (*Sanchez, supra*, 63 Cal.4th at p. 699 [finding prejudicial error because "[t]he main evidence of defendant's intent to benefit [his gang] was [the expert's] recitation of testimonial hearsay"].)

Nor did the erroneous admission of Officer Salazar's case-specific testimony result in any "spillover taint" for the substantive murder count, as appellants contend. In addition to the admissible evidence of the gang motive discussed above, there was overwhelming evidence of premeditation and deliberation and intent to kill. When appellants spotted Mario, they turned their SUV around, returned to his location, and shot him three times. Then Castro later told Pascual they killed Mario and he had gotten his "vengeance." On this record, no reasonable jury would have convicted them of anything less than premeditated murder, so any error in admitting Officer Salazar's testimony does not warrant reversal of the substantive murder counts.

## 5. *Sua Sponte Instruction on Heat-of-passion Voluntary Manslaughter*

Castro contends the trial court erred by not sua sponte instructing the jury on the lesser included offense of heat-of-passion voluntary manslaughter due to Castro's long-simmering provocation for the shooting that left him paralyzed. We disagree.

"'[I]t is the "court's duty to instruct the jury not only on the crime with which the defendant is charged, but also on any lesser offense that is both included in the offense charged and shown by the evidence to have been committed."'" (*Redd, supra*, 48 Cal.4th at p. 732.) "'To warrant [an instruction on a lesser included offense], there must be substantial evidence of the lesser included offense, that is, "evidence from which a rational trier of fact

could find beyond a reasonable doubt" that the defendant committed the lesser offense. [Citation.] Speculation is insufficient to require the giving of an instruction on a lesser included offense. [Citations.] In addition, a lesser included instruction need not be given when there is no evidence that the offense is less than that charged.'" (*Id.* at pp. 732-733.)

"Manslaughter, a lesser included offense of murder, is an unlawful killing without malice. [Citations.] Malice is presumptively absent when a defendant kills 'upon a sudden quarrel or heat of passion' (§ 192, subd. (a)), provided that the provocation is sufficient to cause an ordinarily reasonable person to act rashly and without deliberation, and from passion rather than judgment." (*People v. Cruz* (2008) 44 Cal.4th 636, 664.) "A court is not obligated to instruct sua sponte on voluntary manslaughter as a lesser included offense in the absence of substantial evidence that the defendant acted in a 'sudden quarrel or heat of passion'. . . ." (*People v. Benavides* (2005) 35 Cal.4th 69, 102, citations omitted.) "'The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim.' [Citation.] '[T]he victim must taunt the defendant or otherwise initiate the provocation.'" (*People v. Avila* (2009) 46 Cal.4th 680, 705.) "'"[I]f sufficient time has elapsed for the passions of an ordinarily reasonable person to cool, the killing is murder, not manslaughter."'" (*Ibid.*)

There was no evidence to support a jury finding Castro killed Mario based on a heat of passion, so no instruction was warranted. Castro rests his argument on his "eight months of simmering or boiling anger" engendered by the shooting that left him paralyzed. While he correctly notes a lapse of time between the provocation and the murder is not necessarily dispositive, there still must be some evidence that his "'"reason was, *at the time of his act*, so disturbed or obscured by some passion . . . to such an extent as would render ordinary men of average disposition liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment."'" (*People v. Wharton* (1991) 53 Cal.3d 522, 570-571 (*Wharton*), italics added [provocation by victim over period of weeks]; see *People v. Berry* (1976) 18 Cal.3d 509, 515 [two weeks of provocation by wife victim]; *People v. Wright* (2015) 242 Cal.App.4th 1461, 1486, 1490 [victim's repeated threats to

30

take son away from defendant over course of months, with last provocative act eight hours before murder].) Here, there was no evidence Castro *ever* interacted with Mario, let alone interacted with him over the course of eight months in a way that would have provoked Castro to commit a spontaneous driveby shooting without any deliberation or reflection. Mario was not even directly responsible for Castro's injury; he was the green-lighted shot caller who refused to turn Castro's shooter over for gang discipline. Even if Castro held him equally responsible with the shooter, Castro's months-long "boiling anger" at him constituted nothing more than a desire for revenge, not heat of passion negating malice. (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1139 ["'''[T]he passion aroused need not be anger or rage, but can be any '''[v]iolent, intense, high-wrought or enthusiastic emotion''' [citations] *other than revenge*.'''" (Italics added.)].)

Further, the planning and deliberation surrounding Mario's murder affirmatively negated any finding of provocation. Castro had a personal and gang retaliatory motive to kill Mario, which he confirmed in a text message to his girlfriend after the shooting saying he had gotten his "vengeance." And appellants had a loaded gun in the car when they spotted Mario, at which point they made the deliberate decision to turn Castillo's SUV around, return to where Mario was standing, and kill him. (*Wharton, supra*, 53 Cal.3d at p. 547 [planning occurred in "'very short period of time'" when defendant entered garage, obtained hammer, and returned to house to kill victim with it].) While Castro points out Mario's wife heard someone yell "fuck" or "fuck you," that single comment falls far short of showing provocation sufficient to justify giving a voluntary manslaughter instruction. (*People v. Manriquez* (2005) 37 Cal.4th 547, 586 [taunting and calling defendant "'mother fucker'" insufficient to justify voluntary manslaughter instruction].)

### 6. *Instruction on Primary Activities for Gang Enhancement*

To prove the street gang enhancement, the prosecution was required to show one of the gang's "primary activities" was the commission of "one or more" of 28 enumerated crimes. (§ 186.22, subds. (e), (f); *Nguyen, supra*, 61 Cal.4th at p. 1068.) The jury was instructed that, to find the gang enhancement true, it had to find one or more of the primary activities of appellants' gang was "the commission of crimes such as robbery, assault,

31

extortion, drug cases, and murder." Appellants contend this instruction was erroneous in three respects: (1) "assault" and "drug cases" were not qualifying crimes; (2) the trial court failed to instruct on the elements of any of the listed crimes except murder; and (3) the court allowed the jury to consider other crimes by using the phrase "such as." We agree with appellants' first argument but find the error harmless. We decline to decide whether their second argument is correct because the potential error was harmless. And we reject their last contention.[19]

## A. Nonqualifying Crimes

Two of the crimes included in the list of 28 crimes in section 186.22, subdivision (e) are "[a]ssault with a deadly weapon or by means of force likely to produce great bodily injury, as defined in Section 245," and "[t]he sale, possession for sale, transportation, manufacture, offer for sale, or offer to manufacture controlled substances as defined in Sections 11054, 11055, 11056, 11057, and 11058 of the Health and Safety Code." (§ 186.22, subd. (e)(1), (4).) Appellants are correct "assault" standing alone (i.e., simple assault) does not qualify, and "drug cases" does not define a crime at all, let alone a crime that qualifies as a primary activity. So the instruction given in this case was incorrect. Respondent does not contend otherwise, but argues the error was patently harmless. We agree.[20]

Although "assault" and "drug cases" were nonqualifying crimes, the prosecution's gang expert testified to only *qualifying* crimes as the gang's primary activities: murder,

---

[19] Appellants did not object to the instruction in the trial court, but we decline to find their arguments forfeited. If the court provided a legally incorrect instruction that prejudiced appellants, the error would have affected appellants' substantial rights and no objection was necessary. (§ 1259; *Hernandez, supra*, 183 Cal.App.4th at p. 1331, fn. 2.) Appellants did not invite any error because the record reflects no tactical reason why their counsel acquiesced to the instruction. (*People v. Moon* (2005) 37 Cal.4th 1, 28.)

[20] Citing *Alleyne v. United States* (2013) 570 U.S. __ [133 S.Ct. 2151], appellants contend the federal standard for prejudice applies because the gang allegation increased their minimum term of imprisonment by qualifying them for the 25-years-to-life gang-principal firearm enhancement in section 12022.53, subdivisions (d) and (e). We need not decide this issue because under even the stricter federal standard, the instructional error here was harmless.

attempted murder, *assault with deadly weapons*, robberies, extortions, *sales of narcotics*, possession of firearms, and vandalism. He further specified the Bagos and Tiny Winos cliques focused on extortions, robberies, *sales of narcotics*, and *assaults with deadly weapons*. And he testified that the gang's primary activities included specific convictions of other gang members for *assault with great bodily injury*, murder, and attempted murder. Thus, nothing in the record allowed the jury to conclude that simple assault was one of the gang's primary activities, and the record defined the term "drug cases" for the jury to include only qualifying drug sales crimes.

*B. Elements of Qualifying Crimes*

Appellants contend the trial court improperly failed to instruct the jury on elements of the crimes qualifying as primary activities other than murder. They rely on the bench notes to CALCRIM No. 1401, which state, "The court should also give the appropriate instructions defining the elements of crimes inserted in the list of alleged 'primary activities,' or the definition of 'pattern of criminal gang activity' that have not been established by prior convictions or sustained juvenile petitions." (Bench Notes to CALCRIM No. 1401 (Feb. 2016 rev.) (2016 ed.) p. 1043.) Appellants interpret this comment to mean the trial court need not instruct on the elements of a crime constituting a pattern of criminal gang activity when it resulted in a conviction, but the court was required to instruct on the elements of *all* crimes constituting primary activities, even if it resulted in a conviction. Respondent interprets this comment to mean that when a crime resulted in a conviction, the trial court need not instruct on its elements for it to constitute *either* a primary activity or a pattern of criminal gang activity. Because the prosecution offered evidence of three qualifying convictions, respondent claims there was no error.

Their disagreement appears to boil down to the placement of the comma after the word "activities" in the comment. We need not get mired in this semantic debate because any error was harmless under either state or federal standards. The "primary activities" element of the gang enhancement requires proof that "the commission of one or more of the statutorily enumerated crimes is one of the group's 'chief' or 'principal' occupations." (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323.) That may be shown through

33

evidence "that the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute," which includes both past conduct by gang members and the current crime. (*Id.* at pp. 323-324.) It may also be shown through expert testimony. (*Id.* at p. 324.)

One of the crimes that qualifies as a primary activity is murder. (§ 186.22, subd. (e)(3).) Officer Salazar opined murder was one of the primary activities of the MS gang, the prosecution introduced the records of two convictions of gang members for murder, and the current offense was murder. The court instructed on the elements of murder, and in light of this evidence, it was highly unlikely the jury relied on other *undefined* crimes to find the primary activities element was satisfied. Thus, the court's alleged failure to instruct on the elements of other crimes listed as primary activities would have had no effect on the verdict.

## C. Use of Phrase "Such As"

Appellants contend the court's use of the phrase "such as" in the primary activities instruction allowed the jury to consider other nonqualifying crimes as primary activities. This is pure speculation. Nothing in the record would have prompted the jury to ignore the evidence of the actual predicate crimes and speculate about other crimes beyond those listed in the instruction or supported by the evidence. Thus, there was no reasonable likelihood the jury would have misunderstood the instruction in the way appellants assert. (*Hernandez, supra*, 183 Cal.App.4th at p. 1332.)

## 7. *Admission of Castro's Text Messages Against Castillo*

Castillo argues the trial court violated his confrontation and fair trial rights and abused its discretion under state law when it admitted Castro's text messages to his girlfriend Pasqual shortly after the shooting. He also contends the court erred in refusing to instruct the jury that Castro was an accomplice as a matter of law and his text messages were subject to the accomplice corroboration rule. We reject his contentions.

## A. Procedural Background

Prior to trial, Castillo moved the court to either sever his trial from Castro's or empanel separate juries because the admission of Castro's text messages against him violated his confrontation clause rights under *Bruton v. United States* (1968) 391 U.S. 123

34

(*Bruton*) and *People v. Aranda* (1965) 63 Cal.2d 518.  The prosecution opposed, arguing the text messages were nontestimonial under *Crawford, supra*, 541 U.S. 36, so their admission did not implicate Castillo's confrontation rights, and they were admissible under state law as declarations against penal interest pursuant to Evidence Code section 1230.  After a hearing, the court denied the motion, finding the text messages were declarations against penal interest and were trustworthy because Castro sent them to his significant other soon after the shooting.  As the court explained, "[T]he statements were made immediately thereafter about the incident by someone who wants to tell their significant other, I can't see you.  We are hiding out, this just happened, I've taken my revenge, don't say a word . . . ."  The court also found the high probative value of the text messages was not substantially outweighed by the risk of undue prejudice.  Castillo continued to object to the admission of Castro's text messages during trial.

## B.  Confrontation Clause

Castillo argues at length that the admission of Castro's text messages violated his confrontation clause rights under *Bruton*.  In *People v. Arceo* (2011) 195 Cal.App.4th 556 (*Arceo*), we concluded that, after *Crawford*, *Bruton* applies only to testimonial statements.  As we explained—and contrary to Castillo's arguments—"the confrontation clause applies only to testimonial statements—and nothing in the cases applying that principle to extrajudicial statements by nontestifying codefendants is inconsistent with or purports 'to overrule *Bruton*,' which itself did not address 'any recognized exception to the hearsay rule.'" (*Arceo, supra*, at p. 575.)  Numerous other courts are in accord.  (See *United States v. Vasquez* (5th Cir. 2014) 766 F.3d 373, 378-379 [agreeing with eight other federal circuit courts of appeals that have limited *Bruton* to testimonial statements]; see, e.g., *United States v. Figueroa-Cartagena* (1st Cir. 2010) 612 F.3d 69, 85 ["It is thus necessary to view *Bruton* through the lens of *Crawford* . . . .  The threshold question in every case is whether the

35

challenged statement is testimonial. If it is not, the Confrontation Clause 'has no application.'"].)[21] We decline to revisit the issue here.

Thus, the question is whether Castro's text messages were testimonial. They plainly were not. A statement is testimonial if it was "given in the course of an interrogation or other conversation whose '"primary purpose . . . is to establish or prove past events potentially relevant to later criminal prosecution."'" (*Rangel, supra*, 62 Cal.4th at p. 1214.) Castro's private text messages to his girlfriend shortly after Mario's shooting in no way qualify. (See, e.g., *id.* at pp. 1214, 1217 [statements by family members not testimonial because not made to police and not "made under circumstances suggesting a primary purpose of creating evidence for defendant's prosecution"]; *People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1203 [conversation between defendant and friend not testimonial "because it was not a conversation involving an agent of the police"], overruled on other grounds by *Rangel, supra*, at p. 1216.) Their admission did not implicate Castillo's confrontation clause rights.

*C. State Law*

We also conclude the trial court did not abuse its discretion in admitting Castro's text messages under state law as declarations against interest. Evidence Code section 1230 states in pertinent part: "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, . . . so far subjected him to the risk of civil or criminal liability, . . . that a reasonable man in his position would not have made the statement unless he believed it to be true." A declaration against interest may be admitted in a joint trial if it satisfies the statutory definition and is trustworthy. (*People v. Cervantes* (2004) 118 Cal.App.4th 162, 177 (*Cervantes*).) "There is no litmus test for the determination of whether a statement is trustworthy and falls within the declaration against interest exception. The trial court must look to the totality of the circumstances in which the

---

**21** To the extent Castillo argues *Bruton* created a *separate* rule for extrajudicial statements by co-defendants in a joint trial regardless of whether those statements are testimonial, we reject his argument for the reasons stated in *Arceo*.

statement was made, whether the declarant spoke from personal knowledge, the possible motivation of the declarant, what was actually said by the declarant and anything else relevant to the inquiry." (*People v. Greenberger* (1997) 58 Cal.App.4th 298, 334 (*Greenberger*).) We review the admission of this evidence for abuse of discretion. (*People v. Lawley* (2002) 27 Cal.4th 102, 153 (*Lawley*).)

Castro's text messages that "we hit Dandy," "we killed dandy," "that dog is gone," and "I got my vengeance" were unquestionably against his penal interests. On their face, they were admissions he participated in Mario's murder, and a reasonable person in his position would not have sent them unless he believed them to be true. Castillo disagrees, contending that, because Castro's statements referred to *others* participating in the shooting through use of the pronoun "we," they were not "specifically disserving of Castro's interests." He is correct the declaration against interest hearsay exception does not apply "'"to evidence of any statement or portion of a statement not itself specifically disserving to the interests of the declarant."'" (*Lawley, supra*, 27 Cal.4th at p. 153.) But even as Castro implicated others in the murder, he directly inculpated himself. The messages contained no suggestion whatsoever that he was attempting to shift blame, so they specifically disserved his penal interests. (*People v. Samuels* (2005) 36 Cal.4th 96, 121 [finding no error in admitting declarant's statement implicating defendant because "the reference was inextricably tied to and part of a specific statement against penal interest"].)

The messages were also sufficiently trustworthy. They were sent mere hours after the shooting; they were private; they were sent to his girlfriend at the time; and in them he bragged about getting his "vengeance" against someone he believed was connected to the shooting that left him paralyzed. Those characteristics undeniably indicate the statements were truthful. (*Greenberger, supra*, 58 Cal.App.4th at p. 335 ["[T]he most reliable circumstance is one in which the conversation occurs between friends in a noncoercive setting that fosters uninhibited disclosures."]; see *Cervantes, supra*, 118 Cal.App.4th at p. 175 [statement within 24 hours of shooting to lifelong friend while seeking medical treatment for injuries sustained in commission of offenses was trustworthy].)

37

Finally, the trial court did not abuse its discretion in finding any risk of undue prejudice from Castro's texts did not substantially outweigh their probative value. Castillo argues the probative value of the messages was low because the references to "we" might not have referred to him and because there was some dispute over the proper translation of the phrase "we killed Dandy." Even so, the risk of undue prejudice was virtually nonexistent. The messages did not directly name Castillo as a participant in the murder, and the word "we" only incriminated him when viewed in light of the other evidence (and his counsel's concession) that he was the driver during the shooting. Thus, the court properly admitted the text messages under state law.[22]

## D. Accomplice Corroboration Instructions

Castillo contends the trial court erred in refusing to give his requested accomplice corroboration instructions based on section 1111 in light of Castro's text messages. We disagree.

Section 1111 states: "A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."

"Testimony" under the statute "'includes all oral statements made by an accomplice or coconspirator under oath in a court proceeding *and* all out-of-court statements of accomplices and coconspirators used as substantive evidence of guilt which are made under suspect circumstances. The most obvious suspect circumstances occur when the accomplice

---

[22]    Citing a series of cases, Castillo argues there is an additional constitutional requirement that a statement against penal interest must be excluded "if it 'goes to the heart of the case, if it is "crucial" or "devastating" to the defendant[.]'" (*Greenberger, supra*, 58 Cal.App.4th at p. 330 [identifying cases].) Several courts have rejected this requirement as a misinterpretation of confrontation clause jurisprudence. (*Ibid.*; see *Cervantes, supra*, 118 Cal.App.4th at p. 177; *People v. Fuentes* (1998) 61 Cal.App.4th 956, 967-969.) To the extent this line of authority survives *Crawford*, we agree with the cases rejecting this requirement.

has been arrested or is questioned by the police.' [Citation.] 'On the other hand, when the out-of-court statements are not given under suspect circumstances, those statements do not qualify as "testimony" and hence need not be corroborated under . . . section 1111.'" (*Williams, supra*, 16 Cal.4th at p. 245.)

Here, because Castro's text messages were sufficiently trustworthy to fall within the declaration against interest hearsay exception as discussed above, they were not "testimony" under section 1111 and not subject to corroboration. (*People v. Brown* (2003) 31 Cal.4th 518, 555-556 [declarations against interest not "testimony" under § 1111, so accomplice corroboration instruction not necessary]; see *Williams, supra*, 16 Cal.4th at p. 246 [statements to fellow drug user while using drugs not "testimony" under § 1111].) Thus, the trial court did not err in refusing Castillo's proposed jury instructions.

## 8. *Cumulative Prejudice*

Castro contends the alleged errors we have discussed in parts 1.B. through 4. above created cumulative prejudice warranting reversal. Castillo argues cumulative prejudice from all the alleged errors discussed above. Based on the errors we have found or presumed, appellants were not deprived of a fair trial, and reversal is not warranted.

## 9. *Sentencing Errors*

There are several errors in the abstracts of judgment that must be corrected:

(1) As conceded by respondent, Castro is entitled to one more day of custody credit than the 958 days the trial court awarded, so Castro's judgment must be corrected to reflect 959 days of credit. Although Castillo contends he is also entitled to an additional day of custody credit, his judgment was correct.

(2) Because appellants were sentenced to indeterminate terms, respondent concedes the judgments for both appellants must be corrected to delete the stayed 10-year gang enhancement pursuant to section 186.22, subdivision (b)(1) and instead impose the 15-year minimum parole eligibility term pursuant to section 186.22, subdivision (b)(5). (*People v. Lopez* (2005) 34 Cal.4th 1002, 1004.) Because the jury did not find either appellant personally used a firearm, this enhancement under section 186.22, subdivision (b)(5)

remains stayed pursuant to section 12022.53, subdivision (e)(2).  (*People v. Valenzuela* (2011) 199 Cal.App.4th 1214, 1238.)

(3)  Appellants' abstracts of judgment must be corrected to eliminate the check mark in item 8 that appellants were sentenced pursuant to the "Three Strikes" law (§§ 667, subds. (b)-(i), 1170.12).  Neither appellant had prior strike convictions.

**DISPOSITION**

We modify each appellant's judgment as set forth in part 9 of this opinion.  The trial court is directed to forward corrected abstracts of judgment to the Department of Corrections and Rehabilitation.

In all other respects, the judgments are affirmed.


FLIER, J.

WE CONCUR:


BIGELOW, P. J.


RUBIN, J.